UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LIFE STYLE FUTON, INC., and EASY FIT, INC.,<br><br>                  Plaintiffs,<br>    v.<br><br>EASYFIT SLIPCOVER, LTD., ILYASS ET TAHIRI,<br>TUCOWS, INC., TUCOWS.COM CO., and<br>CABREXA, LLC, and the domain names:<br>**www.easyfitcover.com, www.easyfitslipcover.com,<br>and www.easyfitslipcover.co**, *in Rem.*<br><br>               Defendants. | Case No: 1:21-cv-1482-GHW |

**TUCOWS' MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

## **Table of Contents**

PRELIMINARY STATEMENT ................................................................. 4

RELEVANT BACKGROUND .................................................................. 4

ARGUMENT ........................................................................................ 6

I.  Plaintiffs Fail to Establish Entitlement to Preliminary Relief ................................ 6

   A.  Plaintiffs are Not Likely to Succeed on the Merits ........................................ 7

     i.  Plaintiffs' Claim of *In Rem* Jurisdiction Over The Domain Names Must Fail ........... 7

     ii.  Plaintiffs' Claims  of Contributory Liability Against Tucows are Statutorily Barred . 8

   B.  Plaintiffs Will Not Suffer Harm in the Absence of Preliminary Relief as to Tucows ... 12

   C.  The Balance of Equities Overwhelmingly Favors Tucows ............................ 17

   D.  There is a Profound Public Interest at Stake .............................................. 18

II.  The Specific Relief Sought as to Tucows is Hopelessly Vague and Overbroad ................ 20

CONCLUSION .................................................................................... 25

## <u>Table of Authorities</u>

**Cases**

*Aptus Tech L.L.C. v. Name Administration Inc. (BVI)* (Nat. Arb. Forum, July 17, 2013) ............ 6

*Baidu, Inc. v. Register.com, Inc.*, 760 F. Supp. 2d 312 (S.D.N.Y. 2010) .......................... 9, 19, 25

*In re Worldcom, Inc. Sec. Litig.*
No. 02 Civ. 3288, 2007 WL 2994395 (S.D.N.Y. Oct. 16, 2007) ................................ 20

*Inventel Prods., LLC v. Li*, 406 F. Supp. 3d 396 (D.N.J. 2019). .................................. 12

*Inwood Labs. v. Ives Labs*, 456 U.S. 844 (1982) ................................................. 10, 11

*Lockheed Martin Corp. v. Network Solutions, Inc.*
985 F. Supp. 949 (C.D. Cal. 1997) ................................................... 10, 11, 19

*Mattel, Inc. v. Barbie-club.com*, 310 F.3d 293 (2d Cir. 2002) ........................... 7, 8, 13

*N.Y. State Nat'l Org. For Women v. Terry*, 886 F.2d 1339 (2d Cir. 1989)................................. 20

*Petroliam Nasional Berhad (Petronas) v. Godaddy.com, Inc.,* 737 F.3d 546 (9th Cir. 2013)..... 10

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004)....................................... 4

*S.C. Johnson Son, Inc. v. Clorox Co.*, 241 F.3d 232 (2d Cir. 2001)............................... 20

*Sallen v. Corinthians Licenciamentos* LTDA, 273 F.3d 14 (1st Cir. 2001) ........................ 14, 15

*Sanders v. Air Line Pilots Ass'n, Int'l*, 473 F.2d 244 (2d Cir. 1972) ........................... 20

*Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93 (2d Cir. 2010) ......................................... 11

*Winter v. Natural Res. Def. Council*, 555 U.S. 7 (2008) ............................................. 7

**Statutes**

15 U.S.C. 1114............................................................................. passim

15 USC 1125............................................................................................ 7

Fed.R.Civ.P. 65........................................................................................ 20

S. Rep. No. 106-140................................................................................ 9, 19

Pursuant to the Court's March 2, 2021 Order to Show Cause, (ECF Doc. 31), Defendant Tucows Inc. and, on behalf of its subsidiary, Defendant Tucows.com Co. (together as "Tucows"), hereby submits its Opposition to Plaintiffs' Motion for Preliminary Injunction.

## PRELIMINARY STATEMENT

Plaintiffs petition this Court to grant the emergency relief of a preliminary injunction against Tucows for the act of registering domain names ordered by its customers – a domain registrar's core function. As a domain name registrar, Tucows is statutorily exempt from contributory liability for the registration by its customers of domain names alleged to infringe on a third party's trademark rights. *See* 15 U.S.C. 1114(2)(D)(iii). Plaintiffs completely omit any mention of this obviously and directly controlling statutory provision in their moving papers. This statutory exemption was enacted specifically to protect domain name registrars against proliferation of crippling litigation that would otherwise erupt if registrars were to be held contributorily liable for trademark infringement claims against their customers who use the automated domain registration services which domain registrars provide. Accordingly, Plaintiffs are not likely to succeed on the merits of their single claim against Tucows, and thus the requested injunction must be denied.

## RELEVANT BACKGROUND

Tucows is an Internet domain name registrar, which provides an automated function of allowing customers to select and register Internet domain names, sometimes referred to as "web addresses," and enter such domain names into the corresponding registry. *See, e.g. Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004) (describing the function and accreditation of domain name registrars). Tucows is a publicly traded company with over 25 million domain

names under management and is the second largest internet domain registrar, behind

GoDaddy.com of Arizona. *See* Declaration of Regina Levy dated March 15, 2021 (the "Levy

Dec.") ¶4-6.  This action involves several .com domain names registered with Tucows through a

registration service reseller, Shopify.com, in which the sole involvement of Tucows has been to

enter the customer-specified domain names into the.com registry operated by non-party Verisign

Inc. and into the .co registry operated by .CO Internet SAS and managed by GoDaddy.com.  In

relation to the domain names at issue in this Action, Tucows does not provide web hosting

services – i.e., the service by which web sites convey actual content – and does not participate in

whatever business the other defendants in this action may conduct.  *Id.* ¶ 7-9.

  As an initial matter, Plaintiffs' claims appear to relate to several Internet domain names,

but which the Plaintiffs do not consistently identify.  In the Complaint, the Plaintiffs pray

Defendants be "ordered to transfer the domain www.easyfitcovers.com,

www.easyfitslipcovers.com, www.easfitslipcover.com, and www.cabrexa.com to Plaintiffs."

Complaint, pg. 18 (ECF Doc. 1).  Concerning the first two of these domains sought to be

disabled and transferred, the Plaintiffs state that "Plaintiffs registered and have used their web

domains www.easyfitcovers.com and www.easyfitslipcovers.com, since 2002."  Memorandum

of Law in Support of Injunction pg. 14 (ECF Doc. 13).  The third domain identified in the prayer

for relief by the Plaintiff, easfitslipcover.com does not exist and can be registered by the

Plaintiffs directly, if they so choose.  *See* Levy Dec. ¶ 9-10.

  Of the various domain names identified in the Plaintiffs' contradictory filings in that

regard, Tucows has identified easyfitslipcover.com, easyfitslipcover.co, easyfitcover.com and

cabrexa.com as being registered through Tucows, and which may be the names intended by the

Plaintiffs. *Id*.  As detailed in the Complaint, the Plaintiffs have already been successful in

invoking the abuse policies of the relevant service providers to shut down the corresponding websites at easyfitslipcover.com, easyfitslipcover.co, easyfitcover.com, all three of which remain inoperative.  Complaint, ¶ 31.

Tucows implements a trademark dispute policy known as the Uniform Domain-Name Dispute Resolution Policy (the "UDRP"), which is required of Tucows by the terms of its accreditation agreement with the Internet Corporation for Assigned Names and Numbers and the respective domain registries. *See* Levy Dec. ¶ 11-12, <u>Exhibit B</u>, UDRP and UDRP Rules.  The UDRP provides a streamlined independent administrative proceeding under which Tucows is obligated to transfer a domain name to a complainant upon a panel's finding that "the domain name is 'identical or confusingly similar to' the mark; the registrant has 'no rights or legitimate interests in respect of the domain name'; and the 'domain name has been registered and is being used in bad faith.'" *See Storey v. Cello Holdings, L.L.C*, 347 F.3d 370 (2d Cir. 2003).  UDRP proceedings are commenced with the filing of a Complaint, followed by a 20-day response period and a 14-day adjudication period, after which a decision as to the disposition of the domain name is rendered. *See* <u>Exhibit B</u> to the Levy Dec., UDRP Rules, Section 5(a) and 15(b). A UDRP Panel may decide to transfer a domain name, suspend a domain name, or deny the Complaint.  Additionally, a UDRP Panel may determine whether a UDRP Complaint itself was brought in an abuse of process.  *See, e.g. Aptus Tech L.L.C. v. Name Administration Inc. (BVI)* (Nat. Arb. Forum, July 17, 2013) (rebuking Plaintiffs' counsel for engaging in "reverse domain hi-jacking").  Such decision is implemented after ten business days allowing for the parties to litigate the outcome if desired.  *See* <u>Exhibit B</u> to the Levy Dec., UDRP Rules, Section 4(k).

## **ARGUMENT**

## I.   **Plaintiffs Fail to Establish Entitlement to Preliminary Relief**

To obtain a preliminary injunction, a plaintiff must establish that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008).  For the reasons set forth below, Plaintiffs have failed to establish any of the requisite factors for issuance of a preliminary injunction against Tucows on the ground of contributory liability and thus the Motion should be denied.

### A.  Plaintiffs are Not Likely to Succeed on the Merits

#### i.  Plaintiffs' Claim of *In Rem* Jurisdiction Over The Domain Names Must Fail

To the extent that Plaintiffs claim jurisdiction *in rem* over domain names registered via Tucows, such claim must fail under *Mattel, Inc. v. Barbie-club.com*, 310 F.3d 293 (2d Cir. 2002).  *In rem* jurisdiction over domain names is provided under 15 USC 1125(d)(2), in circumstances where:

> (C) In an in rem action under this paragraph, a domain name shall be deemed to have its situs in the judicial district in which—
>
> (i) the domain name registrar, registry, or other domain name authority that registered or assigned the domain name is located; or
>
> (ii) documents sufficient to establish control and authority regarding the disposition of the registration and use of the domain name are deposited with the court.

Considering whether it is appropriate to exercise *in rem* jurisdiction in this District over domain names registered through registrars located in Maryland or Virginia on the basis of such registrars having provided this District with documents specified by subsection (ii), the Second Circuit held that *in rem* jurisdiction under 15 USC 1125(d) is only appropriate where the registrar is actually located:

> In sum, we hold that the ACPA's basic *in rem* jurisdictional grant, contained in subsection (d)(2)(A), contemplates **exclusively a judicial district within which the**

> **registrar or other domain-name authority is located. A plaintiff must initiate an *in rem* action by filing a complaint in that judicial district and no other.** Upon receiving proper written notification that the complaint has been filed, the domain-name authority must deposit with the court documentation "sufficient to establish the court's control and authority regarding the disposition of . . . the domain name," as required by subsection (d)(2)(D).

*Mattel, Inc. v. Barbie-club.com*, 310 F.3d at 306.  The fatal flaw here relative to the registrar location requirement in subsection (i) cannot be cured by "importing" *in rem* jurisdiction into this district by the referenced document deposit procedure under subsection (ii).  *Id.* at 301 ("Thus, both the language of the statute and its legislative history indicate that *in rem* jurisdiction is a preexisting fact determined by the location of the disputed domain name's registrar or a similar authority, and that the subsequent deposit of sufficient documents with a court of appropriate jurisdiction confirms the domain name's legal situs as being in that judicial district for purposes of the litigation.").  Plaintiffs correctly admit that Tucows is not located in this district.  Complaint, ¶12-13; *See also* Levy Dec. ¶ 6.  Accordingly, the Plaintiffs' claim of *in rem* jurisdiction must fail as there is no relevant domain registrar, registry or other domain name authority located in this judicial district as required for the exercise of *in rem* jurisdiction over the subject domain names under 15 USC 1125(d)(2).

### ii.    Plaintiffs' Claims  of Contributory Liability Against Tucows are Statutorily Barred

Tucows takes no position concerning the Plaintiffs' claims against the web site operator or domain registrant defendants.  As to Tucows in particular, the only specific acts alleged by Plaintiffs are in support of Count 4 for Contributory Trademark Infringement, which is apparently the only claim asserted against Tucows.

Not only are the Plaintiffs' claims of contributory liability against Tucows unlikely to

succeed, but Plaintiffs' claim is statutorily barred and unlikely to survive a motion to dismiss. As an Internet domain name registrar engaged solely in the provision of registrar services in the circumstances of the instant Action, Tucows is entitled to specific statutory exemption from primary or contributory trademark infringement, dilution, or cybersquatting arising from the domain names registered and used by its customers. As this Court has recognized, the Lanham Act provides that:

> "A domain name registrar, a domain name registry, or other domain name registration authority shall not be liable for damages under this section <u>for the registration or maintenance of a domain name for another</u> absent a showing of bad faith intent to profit from such registration or maintenance of the domain name.

> 15 USC 1114 (iii) (emphasis added); As the underlined words make clear, domain registrars are granted immunity from liability for the act of registering or maintaining a domain name for another. *See* S. Rep. No. 106-140, at 11 (1999) (domain registrars are granted immunity to 'promote[] the continued ease and efficiency users of the current registration system enjoy by codifying current case law limiting the secondary liability of domain name registrars and registries for the act of registration of a name') (*citing Panavison Int'l v. Toeppen*, 141 F.3d 1316, 1319 (9th Cir. 1998))."

*Baidu, Inc. v. Register.com, Inc.*, 760 F. Supp. 2d 312, 320 (S.D.N.Y. 2010) (Emphasis in original).

This statutory immunity was enacted as part of a package of amendments to the Lanham Act entitled the Anti-Cybersquatting Consumer Protection Act ("ACPA") (Pub. L. No. 106–113), to address trademark claims arising from Internet domain name registrations. The purpose of Subsection (iii) is to avoid precisely this sort of "sue the domain name registrar on contributory liability" approach to trademark enforcement which had been rejected by courts even prior to enactment of the ACPA. In a comprehensive treatment of domain registrar contributory liability under the Lanham Act, the Ninth Circuit, in relation to precisely what protection was intended to be codified by 14 USC 1114 (2)(D)(iii) held:

By its terms, Section 1114(2)(D)(iii), applies only to "this section," meaning Section 1114. Section 1114, in turn, sets out remedies for the entire Lanham Act, including actions brought under Section 1125(a), which indisputably includes a cause of action for contributory infringement. Thus, the limitations on secondary liability in Section 1114 are equally consistent with the existence or absence of a cause of action for contributory cybersquatting under Section 1125(d). Furthermore, the legislative history of the ACPA establishes that Section 1114(2)(D)(iii) was intended to codify the protection that we granted registrars in *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 984–985 (9th Cir.1999), which considered secondary liability of registrars for trademark infringement under 15 U.S.C. § 1125(a).

*Petroliam Nasional Berhad (Petronas) v. Godaddy.com, Inc.,* 737 F.3d 546, 551 (9th Cir. 2013)(internal citations omitted).

In the referenced decision of *Lockheed Martin Corp. v. Network Solutions, Inc.*, 985 F. Supp. 949 (C.D. Cal. 1997), aff'd 194 F.3d 980 (9th Cir.1999) ("*Lockheed*"), the contributory infringement principles of *Inwood Labs. v. Ives Labs*, 456 U.S. 844 (1982) ("*Inwood*") were applied to the specific context of domain name registrar contributory liability in circumstances where the domain name registrar had declined to act upon a lawyer's demand letter claiming trademark infringement via registration of allegedly infringing domain names.  Supporting the proposition that "the use of an identical or similar mark does not necessarily constitute infringement," the *Lockheed* court catalogued various aspects of trademark infringement analysis, pointing out that infringement determinations can involve various multi-factor tests, doctrines of fair and concurrent use, and that the owner's rights can change over time, such that:

The mere assertion by a trademark owner that a domain name infringes its mark is not sufficient to impute knowledge of infringement to NSI.

[…]

In holding that the degree of uncertainty over infringing uses of domain names makes it inappropriate to impose contributory liability on NSI, the Court is not making new trademark rules for the Internet. Contributory infringement doctrine has always treated uncertainty of infringement as relevant to the question of an alleged contributory infringer's knowledge.

[…] A trademark owner's demand letter is insufficient to resolve this inherent uncertainty.

*Lockheed* at 964.

The Plaintiffs rely on *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93 (2d Cir. 2010) for the general proposition that an online service provider can be required to act on claims of trademark infringement.  The Plaintiffs' reliance on *Tiffany* manages to studiously overlook that in *Tiffany*, the Second Circuit specifically cited *Lockheed* on the question of whether the *Inwood* analysis can be applied to online services generally.  But in so doing, the Second Circuit **also** expressly acknowledged the differing circumstances of the online marketplace of eBay at issue in *Tiffany*, from those of a domain registrar such as Tucows:

> **Although we are not the first court to consider the application of *Inwood* to the Internet, see, e.g., *Lockheed*, 194 F.3d 980, supra (Internet domain name registrar)**, we are apparently the first to consider its application to an online marketplace.

*Tiffany (NJ) Inc. v. eBay Inc.,* 600 F.3d at 105 (emphasis added).  In the present case, the Plaintiffs admit the relevant marketplace services provider, Shopify, has indeed acted at the Plaintiffs' behest to disable the sites in question, consistent with *Tiffany* and its important distinction between marketplace service providers and domain name registrars.

Other Courts have similarly rejected Plaintiffs' argument that a domain name registrar is liable for contributory liability on the mere basis of domain name registrations conducted via that registrar.  As succinctly stated in a similar analysis of *Inwood* in the context of a similar attempt to rope the registrar into a trademark infringement/cybersquatting action:

> Here, like the registrar in *Lockheed Martin* , GoDaddy does not control or monitor the instrument of infringement (i.e., the Website). The allegations against GoDaddy are limited to the registration of the Website's URL, allowing Internet users to access the Website. See Opp. at 2 (waving hosting claims). As the Ninth Circuit made clear, providing such services "does not entail the kind of direct control and monitoring required to justify an extension of" *Inwood Laboratories*' contributory

infringement theories.

*Inventel Prods., LLC v. Li*, 406 F. Supp. 3d 396, 405-06 (D.N.J. 2019).

Here, Tucows' sole involvement with the disputed domain names is as a domain registrar, and not in the provision of content hosting, ecommerce transaction services, or operation of an online marketplace.  *See* Levy Dec. ¶ 9.  The Second Circuit has distinguished between mere domain registrars, and online marketplace services providers in the context of potential contributory liability claims.  Of course, among the distinguishing factors between eBay and a domain registrar is that domain registrar immunity from contributory liability is **an explicit statutory safe harbor** of the Lanham Act as amended by the ACPA. *See* 14 USC 1114 (2)(D)(iii).  As such, Plaintiffs are barred from asserting contributory infringement, dilution or cybersquatting claims against Tucows, and thus Plaintiffs will not succeed on the merits of their one claim against Tucows[1], and the Motion must be denied.

###   B.   <u>Plaintiffs Will Not Suffer Harm in the Absence of Preliminary Relief as to Tucows</u>

The Plaintiffs note that the actual web hosting and ecommerce service provider involved in the operation of the websites formerly accessible via the alleged infringing domain names easyfitslipcover.com, easyfitslipcover.co and easyfitcover.com have been disabled in accordance with the policies of those service providers to whom the Plaintiffs also directed their demands. Complaint, ¶ 31.

Concerning Tucows trademark dispute policy, Plaintiffs deride what they characterize as Tucows' "avowed policy to place the interests of its customers above or ahead of any third party

---

[1] If we have mis-read the Plaintiffs' contentions, *Petroliam Nasional* leaves no doubt as to the applicability of subsection (iii) to secondary liability for false designation of origin under 15 USC 1125(a), cybersquatting under 15 USC 1125(d), and trademark infringement.

IP rights holders," but Plaintiffs fail to factually describe the trademark dispute policy implemented by Tucows.  Complaint ¶ 35.  In addition to providing a safe harbor against trademark claimants, the ACPA, likewise, conferred protection for registrars against claims by their customers in the event of various actions the registrar may take in relation to a domain name pursuant to a "reasonable policy", as embodied in 15 USC 1114 (2)(D)

> (D)(i)(I) A domain name registrar, a domain name registry, or other domain name registration authority that takes any action described under clause (ii) affecting a domain name **shall not be liable for monetary relief or**, except as provided in subclause (II), **for injunctive relief**, to any person for such action, **regardless of whether the domain name is finally determined to infringe or dilute the mark**.

> (II) **A domain name registrar**, domain name registry, or other domain name registration authority described in subclause (I) **may be subject to injunctive relief only if such registrar, registry, or other registration authority has**—

> (aa) not expeditiously deposited with a court, in which an action has been filed regarding the disposition of the domain name, documents sufficient for the court to establish the court's control and authority regarding the disposition of the registration and use of the domain name[2];

> (bb) transferred, suspended, or otherwise modified the domain name during the pendency of the action, except upon order of the court; or

> (cc) **willfully failed to comply with any such court order**.

> (ii) **An action referred to under clause (i)(I) is any action of refusing to register, removing from registration, transferring, temporarily disabling, or permanently canceling a domain name**—

> (I) in compliance with a court order under section 1125(d) of this title; or
> (II) **in the implementation of a reasonable policy by such registrar**, registry, or authority prohibiting the registration of a domain name that is identical to, confusingly similar to, or dilutive of another's mark.

---

[2] The document deposit condition of Subsection (aa) relates to the *in rem* jurisdiction conditions addressed in *Mattel, Inc. v. Barbie-club.com*, 310 F.3d 293 (2d Cir. 2002), and which are not present here.

15 USC 1114 (2)(D)(i)-(ii).  Injunctive relief against a domain name registrar is **only**

available where the domain registrar has (aa) not deposited the requisite control

document with the court in an *in rem* action, (bb) made changes to the domain name

**absent** a court order, or (cc) failed to comply with a court order.  *Id.*  None of the

statutory pre-requisites for injunctive relief against a domain name registrar have been

satisfied here, and thus injunctive relief is not available against Tucows.  Again, these

sections of 15 USC 1114 are embodied in the relevant provisions of the UDRP relating

to actions undertaken in a court of competent jurisdiction, and which is the exact

trademark dispute policy the Plaintiffs deride.

    A fulsome discussion of the interplay among these provisions is not essential to grasp the

point that the ACPA provides a domain registrar with additional immunities from various claims.

These immunities also encompass claims of aggrieved domain registrants in the event the

registrar acts against a domain name pursuant to a "reasonable policy" concerning domain names

which are identical, confusingly similar to, or dilutive of another's mark.  As explained by the

First Circuit:

> **Section 1114(2)(D)(ii)(I) also creates an exception to liability for domain**
> **name registrars that transfer or revoke domain names from registrants**
> **pursuant to a court order.** The purpose of subsections (D)(i)-(ii) is 'to
> encourage domain name registrars . . . to work with trademark owners to
> prevent cybersquatting through a limited exemption from liability for domain
> name registrars . . . that suspend, cancel, or transfer domain names pursuant to a
> court order or in the implementation of a reasonable policy prohibiting
> cybersquatting.' H.R. Conf. Rep. No. 106-464, at 116 (1999); *see also* H.R.
> Rep. No. 106-412, at 15. Subsections (D)(i)-(ii) are, on this reading, quite
> favorable to trademark holders because they encourage domain name registrars
> to cooperate with trademark holders' attempts to assert their trademark rights."

*Sallen v. Corinthians Licenciamentos* LTDA, 273 F.3d 14 (1st Cir. 2001) (emphasis added)

(finding the UDRP to be a "reasonable policy" pursuant to the ACPA).  Here, the Plaintiffs

simply do not want to cooperate with Tucows by following the ACPA "reasonable policy" which is provided for the precise purpose of addressing the Plaintiffs' problem.

Every Internet domain registrar is, in fact, required by the relevant registrar accreditation body, the Internet Corporation for Assigned Names and Numbers, to implement the same trademark policy, denominated the Uniform Domain Name Dispute Resolution Policy, as the Second Circuit has recognized:

> [R]egistrars have agreed, or have been required by ICANN, to incorporate the UDRP into registration agreements . . . and registrants must accept the UDRP's terms in order to register a domain name.

*Storey v. Cello Holdings, L.L.C*, 347 F.3d at 376 n.3 (*quoting Sallen*, 273 F.3d at 20).

Whatever may be the opinion of the Plaintiffs, the UDRP implemented by Tucows has consistently been identified, as in *Sallen* and *Storey*, as a "reasonable policy" called out in the ACPA sufficient to trigger statutory protections of the registrar[3]. Consistent with the observation in *Storey*, the UDRP is applicable to all of the names registered through Tucows against which the Plaintiffs seek relief.  *See* Levy Dec. *¶ 11.*

However, it is worth noting that, outside of the arbitration proceeding defined by UDRP Paragraph 4, the UDRP further prescribes the actions to be taken by a registrar in the event of litigation concerning a domain name.  In particular, UDRP Paragraph 3 further requires:

> 3. **Cancellations, Transfers, and Changes**. We will cancel, transfer or otherwise make changes to domain name registrations under the following circumstances:

---

[3] This is no coincidence, as the ACPA and the UDRP were drafted during the same time period in 1999 and were mutually informed in their development by overlapping bodies of technical, legislative and policy experts relied upon by both Congress and ICANN in the parallel development of the ACPA and the UDRP.

[…]

b. our receipt of an order from a court or arbitral tribunal, in each case of
competent jurisdiction, requiring such action;

Levy Dec. ¶ *14*; <u>Exhibit B</u>, UDRP Rules ¶ 3.

The import of UDRP Paragraph 3, under the circumstances of this case is that the much-derided Tucows' policy in question requires the implementation of any order of this Court in relation to the non-Tucows domain registrant Defendants, in the absence of having named Tucows as a Defendant in this Action.  Hence there is **no reason** for Tucows to be a party to this Action, if the Plaintiffs' intent in naming Tucows was to ensure the "enforceability" of an order involving the domain names or the registrant thereof.

Accordingly, the ICANN-required implementation of the ACPA "reasonable policy" by Tucows would afford the Plaintiffs any definite injunctive relief this Court might grant in relation to the identified disputed domain names, even if Tucows were to be dismissed from this Action or if Tucows had not been named as a Defendant in the first instance.  For the reasons discussed herein, Tucows submits that not only is the Plaintiff not likely to prevail on any claim of liability against Tucows, but that Tucows is more likely to obtain dismissal of such claims because the relevant statute exempts Tucows from such liability on the facts alleged here.  The Plaintiffs will suffer no harm, whatsoever, in the absence of preliminary relief against Tucows, because Tucows is bound by the terms of its ICANN accreditation and the terms of the UDRP to implement whatever orders this Court may issue against the other Defendants in relation to the domain names.

The UDRP implemented by Tucows is further designed to retain the *status quo ante* in relation to court actions concerning disputed domain names, in accordance with UDRP Paragraph 8, by preventing transfers or changes to domain names **except** by court order during a

pending action, as required by 15 USC 1114(2)(D)(i)(II)(bb).  *See* Levy Dec. ¶ 15; <u>Exhibit B</u>,

UDRP Rules ¶ *8*.  However, by maintaining Tucows as a party to this action, the Plaintiffs are

effectively their own worst enemy, since the other provisions of the UDRP fly out of the window

when the registrar is named as a defendant:

> 6. **Our Involvement in Disputes.** We will not participate in any way in any dispute
> between you and any party other than us regarding the registration and use of your
> domain name. You shall not name us as a party or otherwise include us in any such
> proceeding. **In the event that we are named as a party in any such proceeding,
> we reserve the right to raise any and all defenses deemed appropriate, and to
> take any other action necessary to defend ourselves.**

*See* Levy Dec. ¶ 17; <u>Exhibit B</u>, UDRP Rules ¶ *6*.

Accordingly, not only is there a lack of harm to the Plaintiffs in relation to denial of

relief in relation to Tucows, but by insisting on the "sue the domain name registrar"

approach, which the Lanham Act was specifically amended by the ACPA to discourage,

the Plaintiffs are insisting on maintaining an opposing litigant which is unnecessary to

address the Plaintiffs' concerns in relation to the non-Tucows Defendants and their

domain names.

### C.  <u>The Balance of Equities Overwhelmingly Favors Tucows</u>

The balance of equities is best served by allowing the Plaintiffs to pursue whatever claims

they may have, and relief they may seek, against the non-Tucows Defendants – without the

involvement of Tucows in this proceeding.  As should be appreciated at this point, the

interlocking provisions of the ACPA and the UDRP were crafted to allow domain registrars, who

are fundamentally technical service providers, to remain out of the lines of fire among trademark

claimants and defendants, and to provide a neutral and reasonable policy which is designed to

implement competent court decisions upon receipt and to provide a neutral arbitration procedure

for dealing with the "inherent uncertainty" of an Internet domain registrar setting itself up as a

global trademark claims court.  While it may seem superficially reasonable to ask Tucows to

have adjudicated "just this one claim," Tucows is engaged on a day-to-day basis in the

administration of 25 million domain name registrations.  It is this problem of scale, and the un-

demarcated spectrum of potential trademark claims and defenses around the globe, which led to

the implementation of the exemptions embodied in the ACPA and the neutral implementation

policy of the UDRP.  To proceed against Tucows on a contributory liability basis in the face of a

clear statutory and regulatory scheme designed precisely to keep registrars out of trademark

disputes is to invite a domain registrar into every intellectual property action relating to the

internet.  As noted in Lockheed Martin's second attempt at "sue the registrar on contributory

liability" trademark enforcement:

> "Although plaintiff now tries to backtrack somewhat from the position that
> defendant as registrar should perform gatekeeper functions for mark
> owners even the modified gatekeeper role it now proposes is untenable.
> Sheer volume alone would prohibit defendant performing the role plaintiff
> would assign. Defendant simply could not function as a registrar, or as
> keeper of the registry, if it had to become entangled in and bear the expense
> of, disputes regarding the right of a registrant to use a particular domain
> name. **The fact that defendant could theoretically do what plaintiff asks
> does not mean that defendant is obligated to do so at the risk of
> financial ruin. The reason the UDRP was developed was to provide the
> mechanism to resolve these disputes. Not only would imposing
> plaintiffs scheme render the UDRP nugatory, it would cause the
> domain name registration system in its entirety not to be feasible.**"

*Lockheed* at 655 (emphasis added).

### D.  There is a Profound Public Interest at Stake

Stable operation of the Internet domain name system as an engine of commerce, and indeed

online services generally, had grown in economic importance considerably since passage of the

ACPA, and with even increased focus on online services since the advent of the global

pandemic.  A domain name is the starting point of an online presence, and the registrar

protections embodied in the ACPA have allowed competition among registrars to result in a wide variety of service offerings at reasonable prices.  Indeed, it cannot pass without notice here that the ACPA and the UDRP, which maintain registrar non-involvement in the adjudication of trademark claims, provide a model which may be applicable to recent public uproar over perceived arbitrary decisions or lack of due process in the course of operation of social media networks in response to legal, moral or political complaints of one sort or another.  In reference to the registrar immunities embodied in the Lanham Act as amended by the ACPA, the Second Circuit has specifically noted Congressional intent embodied therein that "domain registrars are granted immunity to 'promote[] **the continued ease and efficiency users of the current registration system enjoy by codifying current case law limiting the secondary liability of domain name registrars** and registries for the act of registration of a name.'" *Baidu, Inc. v. Register.com, Inc*., 760 F. Supp. at 320 (*citing* S. Rep. No. 106-140, at 11 (1999)) (emphasis added).

    There is no question that going back to a "sue the registrar for contributory liability" approach, pre-*Lockheed* and pre-1999, will decrease that "ease and efficiency" and it is not clear that a regime under which domain name registrars are pressed into service as trademark adjudicators will produce better, more consistent, or more acceptable results than decisions of courts under the ACPA or arbitration panels under the UDRP.  If vast reaches of the public are uncomfortable with the decisions of technical and policy staff of, say, Twitter and Facebook, then drawing in yet another class of online service provider – a class which has been specifically incentivized with statutory immunity to rely on neutral expert adjudicators effecting a "reasonable policy" and the courts – is not going to serve the public any better.  The internet has grown post-*Lockheed* to become a primary engine of global economic activity which, to be

certain, has produced no small volume of intellectual property disputes among users of the internet and of the domain name system in particular.  Absent exceptional circumstances, however, such disputes should remain among the parties primarily interested in the subject matter of those disputes, and Congress has expressed a clear purpose to avoid dragging domain name registrars as parties into such litigation over the mere provision of domain name registration services at issue in this Action.

**II.**    **The Specific Relief Sought as to Tucows is Hopelessly Vague and Overbroad**

"[E]very order granting an injunction . . . must . . . state the reasons why it issued[;] . . . state its terms specifically; and . . . describe in reasonable detail — and not by referring to the complaint or other document — the act or acts restrained or required."  Fed.R.Civ.P. 65(d).  "`To comply with the specificity and clarity requirements [of Rule 65(d)], an injunction must be specific and definite enough to apprise those within its scope of the conduct that is being proscribed.'"  *S.C. Johnson Son, Inc. v. Clorox Co.*, 241 F.3d 232, 240-41 (2d Cir. 2001) (*quoting N.Y. State Nat'l Org. For Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir. 1989)) (internal citation and quotation marks omitted); *See also In re Worldcom, Inc. Sec. Litig.*, No. 02 Civ. 3288, 2007 WL 2994395, at *4, 2007 U.S. Dist. LEXIS 76272, at *11 (S.D.N.Y. Oct. 16, 2007) ("Rule 65 is concerned with vagueness insofar as a vague injunction poses `the threat of a contempt citation for violation of an order so vague that an enjoined party may unwittingly and unintentionally transcend its bounds.'") (quoting *Sanders v. Air Line Pilots Ass'n, Int'l*, 473 F.2d 244, 247 (2d Cir. 1972)).

In its proposed order, the Plaintiffs appear to ask this court to order Tucows to do two things – (1) "removal of any existing use of the term Easy Fit, EasyFit or variations thereof on any e-commerce selling portal, advertisement, communication to the public, on furniture

coverings and their packaging," and (2) removal of any existing use of the term Easy Fit, EasyFit or variations thereof as a domain name or as part of a domain name, in relation to beddings and furniture coverings.  Proposed Order at page 2 (ECF Doc. 28).

As to the first category of activities sought to be enjoined, absent a program of continuous inspection of every page of every website which may be accessible via any of the 25 million domain names registered through Tucows, they would have no way of knowing whether any domain registrant may be advertising anything denominated "Easy Fit" in relation to goods and services offered in any particular jurisdiction on the planet by the use of a domain name registered through Tucows.  Tucows would have no way of distinguishing authorized sellers of the Plaintiffs goods, even if it found such use.  Furthermore, while the Plaintiffs allege to own rights in the mark "EASY FIT SLIPCOVERS," the relief they seek is much broader, extending to any use of "EASY FIT" or variations thereof, whatever such "variations" might be, and however Tucows is supposed to determine whether someone using "easy fitness" on a website somewhere in the world might be directing commercial activities into the US.

Concerning the breathtaking expansion beyond the US territoriality of its federally registered mark sought in the order, it is also worth noting that the phrase "EASY FIT" appears in the following pending or issued US trademark registration records:

| Application No. | Trademark Text |
|---|---|
| 90401888 | EZYFIT BY MONTAVI |
| 90352937 | EZFIT |
| 90154284 | EASYFIT LIFESTYLE CONTACTS FOR HEALTHY EYES |
| 90037185 | EZFIT |
| 88891801 | E-Z FIT |
| 88643197 | PROFLEX EZ FIT |
| 88032922 | MENICON EASY FIT |
| 88715920 | EASY FIT |

| 88735056 | EZ-FIT |
|----------|--------|
| 88595169 | PROCLEAR EZ FIT |
| 88642258 | EZ FIT |
| 88296568 | EASY-FIT BOOTS |
| 88469609 | E-Z FIT COMFORT BRA |
| 88659612 | EZ-FIT |
| 88023330 | EZ FIT AZURE |
| 88120519 | EZ FIT |
| 87769913 | EZ-FIT |
| 87769906 | EZ-FIT |
| 87585515 | EASY FIT |
| 87447653 | EZFIT |
| 87440157 | EZFIT |
| 87066018 | EZ FIT PILLOW |
| 87850262 | EZ-FIT FIREPLACE DOORS |
| 87335426 | SPORN EASY FIT |
| 87247943 | EASYFIT |
| 86361532 | EASYFIT |
| 86032689 | EASYFIT |
| 86975140 | EASYFIT |
| 86975139 | EASYFIT |
| 86975138 | EASYFIT |
| 86226226 | EASYFIT CORNEOSCLERA LENS |
| 86782546 | EZFIT |
| 86198267 | EZFIT |
| 86909859 | EZ FIT |
| 86330975 | EASYFIT |
| 86712415 | EASIFIT |
| 86416923 | E-Z FIT |
| 86180505 | EZEEFIT |
| 86201879 | EZ-FIT |
| 85913608 | EASY FIT POLY GLOVES |
| 85285810 | EASY FIT |
| 85600260 | EZ-FIT VT |
| 85732317 | EASY FIT |

| | |
|---|---|
| 85762012 | EASYFIT |
| 85812189 | SAFEBASICS EASY FIT |
| 85947930 | EASY-FIT |
| 79283036 | EASYFIT |
| 79120266 | EZ-FIT |
| 79085900 | EASYFIT |
| 79083817 | EASYFIT |
| 78826336 | E Z FIT |
| 78653907 | EASYFIT |
| 78894296 | EASYFIT |
| 78923452 | EASY FIT |
| 78782662 | EASY FIT |
| 78274806 | EZEFIT |
| 78357359 | E-Z FIT FASTENERS |
| 78118413 | E-Z FIT |
| 77794367 | EASYFIT |
| 77128209 | EZFIT |
| 77392239 | E-Z FIT SADDLE |
| 76699104 | EASY-FIT |
| 76371861 | EASY FIT SLIPCOVER |
| 76107905 | EASY-FIT |
| 76271802 | EASY FIT |
| 76224538 | EASYFIT |
| 75533577 | EASY FIT |
| 75713993 | EASYFIT |
| 75459516 | EASY-FIT |
| 74484719 | EASY-FIT |
| 73248357 | EZ-FIT |

*See* Declaration of John B. Berryhill dated March 15, 2021, Exhibit 1.

The Plaintiffs here are merely one of dozens of parties in the United States who may lay claim to rights under the Lanham Act in the term "EASY FIT" in one way or another. The Plaintiffs requested relief thus not only exceeds the scope of the Plaintiffs' claimed rights, but intrudes on

the rightful use of the marks of others within the United States, let alone abroad.  Should Tucows

consider "EZ FIT" to be an intended "variation" of "Easy Fit"?  Is, for example, the US

trademark registration for "EZ FIT PILLOW" included within the scope of the proposed order?

After all, pillows are used in conjunction with sofas which may have slipcovers, but the United

States Patent and Trademark Office appears to have determined that one may use an EZ FIT

PILLOW on one's sofa clad in EASY FIT SLIPCOVERS and remain unconfused as to the

source or origin of one's respective pillow and sofa from different trademark owners.

There is simply no way for Tucows to find out the answers to such questions absent

embarking on this project in relation to more than 25 million domain names, seeing what they

are being used for, and then being subject to either contempt proceedings for making wholly

subjective decisions, on the one hand, or claims of liability by the registrants who are deprived of

their lawfully registered and used domain name registrations on the other hand.  Furthermore,

this investigation would need to be carried out on an ongoing and continuous basis, since the

content accessible at any one of more than 25 million domain names by Tucows customers

around the world may change at any time.  Any website inspected by Tucows and found to be

selling pillows today might be selling slipcovers tomorrow.

It is precisely these sorts of imponderable and impractical scenarios which were intended

to be avoided by the interlocking statutory ACPA statutory scheme and the "reasonable policy"

prescribed therein (i.e. the UDRP) to allow the efficient provision of domain registration services

and the neutral adjudication of domain disputes under the ACPA and UDRP without dragging a

domain name registrar into the dock every time there is a dispute on the internet, or enlisting

domain registrars as the global trademark police.  Absent exceptional circumstances where there

is clear participation, inducement or direct involvement of a domain name registrar in some

infringing scheme, finding registrar liability on the mere selection of domain names by registrants, or the contents of websites hosted by third party service providers, will simply open the floodgates of "let's sue the registrar for contributory liability" in these situations, crippling the "ease and efficiency" of the economically-critical importance of the Internet domain name system, cited by the Second Circuit in *Baidu* as the animating purpose of the registrar exemptions which Congress expressly built into the ACPA.

Thus, the relief sought by Plaintiffs as to Tucows is indefinite and wildly out of scope in relation to the Plaintiffs' claims, and such vague and overbroad relief must be denied.

## **CONCLUSION**

Accordingly, for all of the reasons stated above, the motion for a preliminary injunction must be denied, as against Tucows.

Respectfully Submitted on March 15, 2021,

_____
John B. Berryhill (*Pro Hac Vice* Pending)
John B. Berryhill LLC
204 E. Chester Pike
First Floor Suite 4
Ridley Park, PA 19078
(610) 565-5601 voice/fax
john@johnberryhill.com

_____
Michael D. Cilento, Esq. (MC2221)
Brett E. Lewis, Esq.
Lewis & Lin LLC
81 Prospect Street, Suite 8001
Brooklyn, NY 11201
(718) 243-9323
michael@iLawco.com
brett@iLawco.com

*Attorneys for Defendants Tucows*